## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CARLISLE, individually and as a representative of a class of similarly situated persons, on behalf of the NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, <br><br> Plaintiff, <br><br> v. <br><br> THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF THE NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND; JOHN BULGARO; BRIAN K. HAMMOND; PAUL A. MARKWITZ; GEORGE F. HARRIGAN; MARK D. MAY; MICHAEL S. SCALZO, SR.; ROBERT SCHAEFFER; MARK GLADFELTER; SAMUEL D. PILGER; DANIEL W. SCHMIDT; TOM J. VENTURA; MEKETA INVESTMENT GROUP, INC.; and HORIZON ACTUARIAL SERVICES, LLC, <br><br> Defendants. | **Case No.** <br><br><br><br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff, Robert Carlisle ("Carlisle" or "Plaintiff"), by and through his attorneys, and on behalf of New York State Teamsters Conference Pension and Retirement Fund ( "Plan"), himself a Plan participant, and all others similarly situated, alleges as follows:

## I.    NATURE OF ACTION AND INTRODUCTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461("ERISA"). The action asserts claims for breaches of fiduciary duties and other violations of ERISA §§ 502, 29 U.S.C. §1132(a)(2) and (3), against the Plan's fiduciaries, which include: (1) Board of Trustees of the New York State Teamsters Conference

Pension and Retirement Fund ("Board of Trustees"); (2) current and former Trustees John Bulgaro, Brian K. Hammond, Paul A. Markwitz, Mark D. May, Michael S. Scalzo, Sr., Robert Schaeffer, Mark Gladfelter, Samuel D. Pilger, Daniel W. Schmidt, and Tom J. Ventura (the "Trustee Defendants"); (3) Meketa Investment Group, Inc. ("Meketa"); and (4) Horizon Actuarial Services, LLC ("Horizon") (collectively, "Defendants").

2.      Under ERISA, a person is a fiduciary to the extent the person: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

3.      ERISA imposes strict fiduciary duties of loyalty and prudence upon Plan fiduciaries. Under 29 U.S.C. § 1104(a), ERISA provides:

(a) Prudent Man Standard of Care

(1)  . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

4.    29 U.S.C. § 1103(c)(1) provides that Plan assets shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

5.    ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

6.    Under ERISA, fiduciaries are required to determine the prudence of each investment of Fund's assets and to monitor and review the investments, risk tolerance and exposure of the Fund on a continuing basis to determine the continued prudence of the asset allocations, risk, and expenses, under the particular circumstances facing the plan. The duty to conduct an independent investigation into the merits of a particular investment is a basic aspect of the fiduciary duties under ERISA. Fiduciaries must use appropriate methods to investigate the merits of plan investments. Fiduciaries must initially determine, and continue to monitor, the prudence of each investment option in the Plan. The continuing duty includes the duty to remove imprudent investments and to evaluate the costs of investment managers versus the result produced by the

managers to ensure that there is a net financial benefit to the Fund versus alternatives such as low-cost passive index strategies. The continuing duty also includes the duty to monitor and manage the risk of the Plan's investments to maintain an efficient investment portfolio which appropriately diversifies and avoids excessive imprudent risk exposure to the Plan's assets and returns in accordance with the circumstances facing the Plan. The continuing duty exists separate and apart from the duty to exercise prudence in selecting the investments and investment managers and costs at the outset. The monitoring must be done in a manner that is reasonable and appropriate for the particular investments, courses of action, strategies and risk tolerance of the Plan.

7.      29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

8.      Section 1132 (a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions and his subchapter or the terms of the plan."

9.      Plaintiff claims, as alleged herein, the Trustee Defendants have:

(a)      failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A);

(b)      failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B);

(c)      failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and

(d)      failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Defendants breached their fiduciary duties to the Plan and its participants and are liable to restore all losses to the Plan resulting from their breaches, as alleged more particularly herein.

10.      Plaintiff claims, as alleged herein, from 2014 and continuing ("Class Period"), the Board of Trustees and the Trustee Defendants imprudently deployed and maintained the Plan assets in an extraordinary high risk, high cost asset allocation to chase a grossly excessive and unreasonable 8.5% "actuarial return target," as the Plan remained in dangerous and worsening financial condition and required near-term investment returns to improve. The deployment and maintenance of the extraordinary asset allocation resulted in substantial losses to the Plan and worsening of the Plan's already dangerous financial condition.

11.      Plaintiff claims, as alleged herein, during the Class Period, the Plan's enrolled actuary Horizon breached its fiduciary duties in exercising discretion or control over Plan management and assets and rendering investment advice for compensation. Horizon, as the Plan's enrolled actuary, in 2007, recklessly increased the actuarial return assumption from 8% to 8.5%. Within months of the increase in the assumption, the Plan was certified as being in "endangered status" for the Plan Year beginning January, 2008. Nevertheless, Horizon continued to use this

grossly excessive and unreasonable 8.5% actuarial return assumption for the Plan, knowing the Plan would chase this unrealistic return assumption with extraordinary allocations of Plan assets to the riskiest asset classes. The 8.5% assumption was not a reasonable actuarial return assumption determined independently in accordance with professional actuarial standards. Horizon abdicated its duties as the Plan's actuary independently to determine reasonable actuarial assumptions in accordance with accepted professional standards, and imprudently participated in providing investment advice to the Plan to chase the imprudent extraordinary high risk, high cost asset allocation.

12.    Plaintiff claims, as alleged herein, during the Class Period, Meketa, the Plan's investment consultant and alternatives asset manager, breached its fiduciary duties in exercising authority or control over Plan management and assets and providing investment consulting services and investment management services for compensation. Meketa used its position as the Plan's nondiscretionary investment consultant to recommend itself for the position of the Plan's paid discretionary investment manager; advised the Trustees as the Plan's nondiscretionary investment consultant the only way to strive to achieve the "actuarial return target" was with extraordinary significantly overweighted allocations of Plan assets to the highest risk asset classes including Emerging Markets Equities ("EME") and Private Equity ("PE") and other private market alternatives under Meketa's discretionary management; and directly and substantially benefited by the imprudent asset allocation at the unfair expense of the Plan and the participants. As alleged herein, in providing investment advice to the Trustees concerning the Plan's extraordinary high risk, high cost asset allocation in its capacity as nondiscretionary investment consultant, and also providing discretionary alternatives investment management to the Plan for additional compensation, Meketa had and exploited a material conflict of interest at the expense of the Plan.

Plan fees paid to Meketa soared from $250,000 to $1.4 million annually. Further, as a result of the conflicts created by the Plan's Trustees' hiring of Meketa as investment manager for the Private Markets Portfolio, it was necessary for the Plan to hire a firm to monitor Meketa in the role as investment manager at an additional cost to the Plan. This additional cost would not have been necessary if the Trustees had hired someone other than Meketa as an investment manager for the Private Markets Portfolio. Further, the Plan was required to bear the approximately $180,000 per year expense for the monitoring firm, Fiduciary Counselors, Inc. ("FC"), an additional fiduciary to monitor Meketa as investment manager. The Trustee Defendants did not hire FC  to monitor Meketa in its role as financial consultant.

13.    To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and as a representative of a class of Plan participants and their beneficiaries, brings this action on behalf of the Plan under ERISA §§ 502 and 409, 29 U.S.C. §§ 1132, 1109, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

14.     Plaintiff brings this action on behalf of the Plan to recover the following relief:

a.    declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.    a permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.    equitable, legal, or remedial relief for all losses and/or compensatory damages;

    d.      attorneys' fees, costs and other recoverable expenses of litigation; and

    e.      such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    <u>JURISDICTION AND VENUE</u>

15.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and (3).

16.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because the Plan and Meketa can be found in the District. Meketa resides and can be found in the District. The Plan can be found in the District because it does extensive business with many Plan investments situated in the District.

17.    Plaintiff has standing to bring this lawsuit on behalf of the Plan under § 1132(a)(2) and (3). The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Section 1132(a)(2) authorizes any participant or beneficiary to sue as a representative of the Plan to seek relief on behalf of the Plan. Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the Plan to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA. As explained in detail below, the Plan suffered substantial investment losses and lost returns and harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

## III.    <u>PARTIES</u>

### A.    <u>Plaintiff</u>

18.    Plaintiff Robert Carlisle is a citizen of Potsdam, New York and a current

participant in the Plan as defined by 29 U.S.C §1002(7). Carlisle has been a participant in the Plan since prior to 2014. Plaintiff, through his undersigned counsel, requested and obtained internal Plan documents pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4). The allegations herein are based on, among other things, the internal Plan documents.

**B.    Defendants**

19.     Defendant, the Board of Trustees of the New York State Teamsters Conference Pension and Retirement Fund, is the Plan Sponsor, pursuant to 29 U.S.C. § 1002(16)(B).

20.     The Trustee Defendants are the Plan's named fiduciaries with authority to manage and control the administration and operation of the Fund and the Plan. The Trustee Defendants exercised authority and control over Plan management assets and thus are Plan fiduciaries in doing so. The Defendant Trustees are adult individuals who currently and/or formerly serve(d) as Trustees to the Plan.  The Plan is a multiemployer jointly administered Plan, with an equal number of union Trustees and employer Trustees. The current Union Trustees are John A. Bulgaro (Co-Chairman), Brian K. Hammond, George F. Harrigan and Mark D. May. The current Employer Trustees are Michael S. Scalzo, Sr. (Co-Chairman), Mark A. Gladfelter, Samuel D. Pilger and Daniel W. Schmidt. Trustee Defendants also include the following former Trustees: Paul A. Markwitz; Robert Schaeffer; and Tom J. Ventura.

21.     Meketa is a global investment consulting and advisory firm incorporated under the laws of the Commonwealth of Massachusetts. In April 2019, Meketa combined with Pension consulting Alliance, LLC. Meketa continues to be a privately held firm with Co-CEOs Steve McCourt and Peter Wooley, each of whom holds a 14% ownership position. Jim Meketa is the Founder and Chairman Emeritus, and holds a 24% ownership position. Meketa is a registered investment advisor (SEC#: 801-14519). Meketa holds itself out as providing services to

corporations, financial intermediaries, multiemployer plans, public funds, private wealth clients, endowments, foundations, and healthcare organizations. The contact information included in Meketa's reports to the Plan during the Class Period lists 7 offices: Boston; Portland; Dan Diego; Chicago; Miami; New York; and London. The New York location is 48 Wall St., 11th Floor, New York, NY 10005. Prior to and during the Class Period, Meketa provided both nondiscretionary investment consulting services and discretionary investment management services to the Plan for compensation. Meketa was a fiduciary to the Plan because it rendered investment advice to the Plan for a fee and exercised discretion and authority over Plan assets as an investment manager.

22. Horizon is an actuarial consulting firm incorporated under the laws of the state of Delaware. Horizon provides actuarial solutions to multiemployer benefit plans. Horizon claims to serve over 120 pension and health and welfare plan in various industries, including construction, trucking, professional sports, hospitality, entertainment, retail food, and communication. Horizon's services include actuarial valuations, PPA compliance, actuarial projections, withdrawal liability, plan design and implementation, rate setting and vendor marketing, and second opinion actuarial review. Horizon has a principal place of business located at 1040 Crown Pointe Parkway, Suite 560, Atlanta, GA 30338, and it maintains offices throughout the United States. Horizon is the Plan's enrolled actuary. During the Class Period, as alleged herein, Horizon exercised authority or control over Plan assets and management, and rendered investment advice for a fee, and thus was a fiduciary.

## IV.   THE PLAN AND ITS ADVISORS

23. The name of the Plan is the New York State Teamsters Conference Pension and Retirement Fund. The Plan has been assigned the Plan Number 074, and its Employer

Identification Number (EIN) is 16-6063585. The Plan assets are held in a trust under the Agreement and Declaration of Trust, as amended.

24.     Established in 1954, the Plan is a defined benefit, non-contributory, multi-employer joint-trust pension plan subject to ERISA. In this action, pursuant to ERISA § 409, and the law interpreting it, the relief requested is for the benefit of the Plan and its participants and their beneficiaries. The Plan is maintained in accordance with numerous collective bargaining agreements between unions and employers. The purpose of the Plan is to provide pension benefits to members of unions that have agreements to make contributions to the Plan. The Plan is funded by employer contributions and Plan investment returns.

25.     According to the Plan's Form 5500 for fiscal year 2018, as of December 31, 2018, the Plan held $1,467,462,730 in total assets, with 33,606 participants, inclusive of active participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits. As of May 2017, the Plan had 180 participating union employers.

26.     The Plan Sponsor is the Board of Trustees of the New York State Teamsters Conference Pension and Retirement Fund, located at 151 Northern Concourse, Syracuse, New York 13212-4047. The Plan's named fiduciaries are the Trustees. The Board of Trustees includes an equal number of Union Trustees (4) and Employer Trustees (4). The current Union Trustees are John A. Bulgaro (Co-Chairman), Brian K. Hammond, George F. Harrigan, and Mark D. May. The current Employer Trustees are Michael S. Scalzo, Sr. (Co-Chairman), Mark A. Gladfelter, Samuel D. Pilger, and Daniel W. Schmidt. The Board of Trustees' mailing address is P.O. Box 4928, Syracuse, New York 13221-4928.

27.     The Plan fiscal year is the calendar year, i.e., January 1 to December 31.

28.     Meketa is the Plan's nondiscretionary financial consultant. Meketa also is the Plan's discretionary manager for the Plan's private market alternative investments, including PE and certain other alternatives.

29.     Fiduciary Counselors, Inc. is the Plan's monitor of Meketa in Meketa's role as discretionary investment manager for the Plan's Private Markets Portfolio. According to the Plan's Form 5500s, for the Class Period, FC was compensated by the Plan as follows:

| Year | Compensation | Service Code(s) | Service Code Type |
|------|--------------|-----------------|-------------------|
| 2014 | $180,530 | 27; 50 | Investment Advisory (plan); Direct payment from the plan |
| 2015 | $180,543 | 27; 50 | Investment Advisory (plan); Direct payment from the plan |
| 2016 | $180,125 | 27; 50 | Investment Advisory (plan); Direct payment from the plan |
| 2017 | $182,858 | 27; 50 | Investment Advisory (plan); Direct payment from the plan |
| 2018 | $181,453 | 27; 50 | Investment Advisory (plan); Direct payment from the plan |
| Total | $905,509 | | |

30.     Horizon is the Plan's enrolled actuary.

## V.     SUBSTANTIVE ALLEGATIONS

31.     During the Class Period, the Board of Trustees, the Trustees and their advisors imprudently deployed and maintained the Plan's assets in an extraordinary, high-risk, high-cost investment and funding strategy to chase an unreasonable and grossly excessive 8.5% "actuarial return target," as the Plan was in dangerous and worsening financial condition, in breach of their fiduciary duties under ERISA. Defendants persisted with the extraordinary risk in the face of continuing evidence the return assumptions were not reasonable or reliable, volatility and near term losses in high risk asset classes such as EME posed a danger to the Plan's financial condition even if higher returns were achieved in later years, the Plan faced massive illiquidity risk on the

35-40% of Plan assets in PE and other private market alternatives, the Plan's funded status continued to decline, and the Plan's financial condition further deteriorated.

### A.    Dangerous Financial Condition of Plan

32.    From 2010 – 2017, the Plan's funded percentage steadily declined until the Department of Treasury approved extraordinary benefit cuts pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"):

| Year | Funded Percentage |
|:---:|:---:|
| 2010 | 62.88% |
| 2011 | 61.97% |
| 2012 | 52.25% |
| 2013 | 45.6% |
| 2014 | 46.5% |
| 2015 | 45.6% |
| 2016 | 45.8% |
| 2017 | 45.2% |
| 2018 | 57.0% |
| 2019 | 55.8% |

### 1.    Critical Status Under The PPA

33.    The Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780. ("PPA") imposed new funding requirements on single-employer and multiple employer defined benefit plans, requiring funding certifications based upon the funded level of the plan. In April 2008, the Plan provided notice to participants the Plan certified its funding status was in the "Endangered Status" (yellow zone) under the PPA for the Plan Year beginning January 1, 2008. "Endangered" meant that the Plan was less than eighty percent funded.

34.    The PPA requires the sponsor of an endangered plan to develop a Funding Improvement Plan ("FIP"), aimed at avoiding accumulating additional funding deficiencies and increasing a plan's funded percentage in accordance with certain benchmarks as of the close of the Funding Improvement Period. *See* 26 U.S.C. § 432. The Plan's FIP was required to be designed to

13

have the Plan achieve certain mandatory funding benchmarks by the end of a ten-year Funding Improvement Period.

35. The Plan was expected to be 76% funded in 2008. The FIP was designed to increase the Plan's funded percentage 8%, to 84% within 10 years. Horizon, the Plan's enrolled actuary, employed an 8.5% investment return assumption to project the 84% funded point in 10 years. Horizon knew or should have known the 8.5% investment return assumption in the FIP funding and actuarial projections was grossly excessive and unreasonable—particularly for an already "endangered" plan— and it grossly inflated the Plan's funding projections. Internal Plan documents show that the 8.5% assumption was an "actuarial return target" to chase with high risk assets, not an independently determined actuarial return assumption by the Plan's actuary in accordance with applicable professional standards.

36. By Plan year 2010, the Plan was only 62.9% funded. Accordingly, the Plan entered "Critical Status" (red zone) under the PPA, meaning that the Plan was less than sixty five percent (< 65%) funded for the Plan year. "Critical status" required the Plan to begin operating under a Rehabilitation Plan ("RP") to improve funding and preserve plan assets and benefits.

37. On May 6, 2010, the Board of Trustees adopted a RP, effective January 1, 2011. RP is required to enable plans to emerge from "critical status" by the end of set rehabilitation period unless the Plan "determines that, based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures," the Plan is not reasonably expected to emerge from critical status by the end of the rehabilitation period, in which case, the Plan was permitted to adopt a rehabilitation plan that includes reasonable measures designed to allow the pension fund to emerge from critical status at a later time or forestall possible insolvency. The Plan's Rehabilitation Plan stated:

> After consideration of various alternatives and exhaustion of all reasonable measures, the Trustees have determined that it would not be reasonably possible for the Fund to emerge from critical status under the PPA by the end of its rehabilitation period. This conclusion is based on the advice and recommendation of the Fund's actuaries and their use of reasonable actuarial assumptions.

*Id.* The Plan's rehabilitation period began on January 1, 2013 (*see* The New York State Teamsters Conference Pension and Retirement Fund, Status Certification Report and Actuarial Certification for the Plan Year Beginning January 1, 2013). (REHABILITATION PLAN FOR THE NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND Effective January 1, 2011 Amended and Restated December 15, 2010, https://www.nystpensionfund.org/media/1061/final-rehabilitation-plan.pdf)

38.     By January 1, 2013, the Plan was 45.6% funded, a decrease of more than 7% from 2010. Investment returns for Plan year 2013 were just over 5%.

39.     The Board of Trustees told participants in the Plan's Summer 2013 newsletter:

> While the NYS Fund certainly faces major headwinds, the most important question from participants and beneficiaries is whether there will be sufficient money to pay pension benefits that have been earned and promised.  The simple answer is: Yes! Based on the best information and advice from the Fund's actuarial and investment professionals, the Trustees have taken the necessary steps to ensure that there will be assets to pay pensions.

New York State Teamsters Benefit Funds Newsletter, Summer 2013, available at https://www.nystpensionfund.org/media/1056/2013-summer-newsletter.pdf  (last  visited Sept. 20, 2020).

40.     In the Fall 2014 Plan newsletter, the Trustees stated:

> Every year, the question participants and beneficiaries ask the most is whether there will be sufficient money to pay pension benefits that have been earned and promised.  The simple answer remains: Yes! Based on the best information and advice from the Fund's actuarial and investment professionals, the Trustees have taken the necessary steps to ensure that there will be sufficient assets to pay pensions.

15

New York State Teamsters Benefit Funds Newsletter, Fall 2014 Plan newsletter, available at https://www.nystpensionfund.org/media/1057/2014-fall-newsletter.pdf (last visited Sept. 24, 2020).

### 2. Critical and Declining Status

41.     The Multiemployer Pension Reform Act of 2014 ("MPRA") established new options for trustees of multiemployer plans in jeopardy of insolvency. The MPRA provided new certification levels: Safe (green), Safe due to special rule (olive), Endangered (yellow), Seriously endangered (orange), Projected to be critical in any of 5 succeeding years (pink), Critical (red), and Critical and declining (gray).

42.     As of Plan year 2015, the Plan was 45.6% funded.

43.     On January 7, 2016, the Plan gave notice its actuary certified the Plan as being in "Critical and Declining" status under the MPRA. The funded percentage of the Plan was 45.8%. Under the MPRA, a plan is "critical and declining" if it is projected to become insolvent as provided under ERISA § 305(b)(6). The MPRA permits a plan in "critical and declining" status to seek authorization from the Department of Treasury to suspend earned benefits to combat projected insolvency. The Plan is considered insolvent if it is unable to pay benefits (at least equal to the federally guaranteed limit) when due. As of late 2017, the Plan was projected to be insolvent by 2026.

44.     On August 31, 2016, the Plan filed an application under MPRA for reduction of pension benefits. The original application was withdrawn. In a notice from the Plan, the Trustees noted Treasury preferred the Fund use a different mortality table and asked that Fund actuaries better explain the use of lower investment assumptions. New York State Teamsters Conference Pension and Retirement Fund, "Pension Fund to Withdraw and Refile MPRA Application to

Address    Two    Actuarial    Issues    Identified    by    Treasury    Dept.,"    available    at
https://d3n8a8pro7vhmx.cloudfront.net/teamstersforademocraticunion/pages/9328/attachments/o
riginal/1491583115/NYS_Fund_withdrawal-and-refile-notice.pdf?1491583115 (last visited Sept.
24, 2020).

45.     On May 15, 2017, the Plan submitted a revised MPRA application. The revised
application was approved by Treasury on September 13, 2017, with benefit reductions
implemented as of October 1, 2017.

### 3. Benefit Reductions

46.     The Plan implemented massive benefit reductions, including a 29% reduction for
retired participants, and a 19% reduction for active participants, in addition to the reductions
implemented under the RP. The average cut for a retired participant was approximately $2,000 to
$3,500, from $5,000.

### B. Imprudent Extraordinary, High-Risk, High-Cost Asset Allocation To Chase Excessive and Unreasonable 8.5% "Actuarial Return Target"

47.     Internal Plan documents show during the Class Period, the Trustees and their
advisors imprudently deployed and maintained a high-risk, high-cost asset allocation with an
extraordinary percentage of the Plan's assets in the highest risk and costliest asset classes, to chase
a grossly excessive and unreasonable 8.5% "actuarial return target," as the Plan's financial
condition worsened and the Plan required returns failed to improve.

48.     The Plan's Investment Policy Statement ("IPS") provides "[t]he investment
strategy of the [Plan] is designed to ensure the prudent investment of funds in such a manner as to
provide real growth of assets over time while protecting the value of the assets from undue
volatility or risk of loss." The IPS "Risk Objectives" are: "To accept a level of market risk
consistent with moderate interim volatility without sacrificing the potential for long-term real

growth of assets"; "To use extensive diversification to minimize exposure to company and industry-specific risks in the aggregate investment portfolio"; and "To avoid extreme levels of volatility that could adversely affect the Plan's participants". The IPS "Risk Objective" is "Within the constraints outlined above, to achieve the highest real return possible."

49.     Defendants' adoption of the high-risk, high-cost asset allocation in order to chase a grossly excessive and unreasonable 8.5% "actuarial return target conflicted with these provisions of the Plan's IPS.

**1.  Grossly Excessive and Imprudent 8.5% Actuarial Return Target**

50.     As the Plan's enrolled actuary, Horizon has a professional duty to provide actuarial services consistent with relevant generally accepted standards for professional responsibility and ethics. § 901.20 Standards of performance of actuarial services, 20 CFR Ch. VIII (4-1-12 Edition), (b) *Professional duty*. Additionally, in performing its duties, Horizon is required to ensure that "…the actuarial assumptions are reasonable individually and in combination…" § 901.20 Standards of performance of actuarial services, 20 CFR Ch. VIII (4-1-12 Edition), (e) *Assumptions, calculations and recommendations*. During the Class Period, Horizon determined and used an 8.5% actuarial return assumption for the Plan. Horizon knew or should have known the 8.5% was grossly excessive and unreasonable under accepted actuarial standards. Horizon knew or should have known the 8.5% failed to account for the extraordinary excessive cost and risk in the Plan's portfolio.

51.     Professional actuarial standards require that the investment return assumption be "reasonable." Actuarial Standards of Practice No. 27 – Selection of Economic Assumptions for Measuring Pension Obligations, Section 3.6, Selecting a Reasonable Assumption. In turn, reasonability requires that the assumption exhibit no significant bias, i.e., it is not significantly

optimistic or pessimistic. ASOP No. 27, Section 3.6 (e).  Horizon knew or should have known the 8.5% assumption used during the Class Period exhibited significant bias, in particular given the published results of its very own "Horizon Survey of Capital Market Assumptions."  For example, the Horizon Survey, 2015 Edition, stated the probability of achieving an 8% return over a 10-year period was less than 1/3 based on its survey of investment professionals. https://www.horizonactuarial.com/uploads/3/0/4/9/30499196/horizon_cma_survey_2015_v0731. pdf. Use of the 10 year projection in the Horizon survey (vs. the 20 year projection) was appropriate given the critical funded status and negative cash flows.  In 2015, the probability of achieving an 8.5% return was likely barely more than 25% via simple extrapolation of published probabilistic results.

52.    Actuaries are ultimately responsible for selecting assumptions not otherwise mandated by law or set by third parties.  Indeed, Horizon acknowledges its responsibility in selecting the 8.5% assumption:

> The investment return assumption used for purposes of the ERISA funding valuation is a reasonable estimate of the long-term net investment return for the Plan's assets and, in combination with the other assumptions used, provides our best estimate of anticipated experience under the Plan.  The valuation interest rate was chosen based on our professional judgement, the Plan's asset allocation and investment policy, past experience, and the results of Horizon Actuarial's 2016 Survey of Capital Market Assumptions. New York State Teamsters Conference Pension and Retirement Fund, Actuarial Valuation as of January 1, 2016, Appendix B, Actuarial Assumptions and Methods, Interest Rates.

53.    While Horizon's language on the investment assumption selection purportedly complies with the disclosure requirements of ASOP No. 27, Section 4.1.2, it lacks sufficient detail for another actuary to assess its reasonableness as required under Section 4.1.1.  This lack of disclosure is presumably because the 8.5% assumption simply cannot be justified:

a.  Section 3.8.3 (a) of ASOP No. 27 requires the actuary to explicitly consider the Plan's Investment Policy, which is not disclosed elsewhere in the Actuarial Report;

b.  Section 3.8.3 (d) of ASOP No. 27 cautions against anticipating superior investment manager performance:  "The actuary should not assume that superior or inferior returns will be achieved, net of investment expenses, from an active investment management strategy compared to a passive investment management strategy unless the actuary believes, based on relevant supporting data, that such superior or inferior returns represent a reasonable expectation over the measurement period."  Horizon provides no such supporting relevant data to justify expected returns.

c.  Section 3.8.3 (g) of ASOP No. 27 cautions that the timing of expected contributions and benefit payments may affect the plan's liquidity needs and investment opportunities.  Since the Plan is poorly funded, with significant negative cashflows, Horizon should have considered these factors instead of selecting an assumption which represented "…a reasonable estimate of the long-term net investment return…"

Given Horizon's material deviation from the requirements set forth in ASOP No. 27, Horizon further erred in not disclosing this deviation, as required under Section 4.3 (b).

54.  Finally, Horizon failed to reduce its 8.5% assumption during the Class Period, which is contrary to prevailing actuarial practice which saw routine, predictable, and justified reductions in assumed investment returns.

a.  Horizon's own capital market surveys during this time period showed a continued decline in the probability of achieving a 7.50% return for a benchmark multiemployer plan portfolio, from 40.6% in 2014 to 33.6% in 2019.

b.  Assumption surveys from Deloitte illustrate declines in the average investment return assumptions used in corporate financial reporting from 7.10% in Fiscal 2014

to 6.54% in Fiscal 2018, with approximately 1/3 of respondents lowering their assumptions each year. Fortune 500 companies with defined benefit plans.

c. Assumption surveys from Willis Towers Watson show similar declines in average assumed investment returns from 6.95% in 2016 to 6.49% in 2019. Survey of 1,000 + companies with global operations, US assumptions only.

55. Internal Plan documents obtained by Plaintiff show the 8.5% assumption was in fact an "actuarial return target." The Trustees and their advisors imprudently determined and maintained the Plan's extraordinary high risk, high cost asset allocation to chase the grossly excessive and unreasonable 8.5% "actuarial return target." Meketa advised the Trustees in March 2014: "In order to continue to assume the Fund's 8.5% target return, the Fund must be significantly invested in asset classes that are expected to outperform 8.5% over long-term periods." In May 2014, Meketa advised: "The overweight to emerging markets equities and private equities enable the Fund to assume an 8.5% expected return." Horizon knew or should have known an 8.5% actuarial investment return assumption to project the Plan's actuarial funding and liabilities was unreasonable and unsupportable by an actuary independently determining the assumption under applicable professional standards, and determining and employing an 8.5% "actuarial return target" to construct an extraordinary high risk, high cost asset allocation was imprudent and misleading in the Plan's dangerous financial condition.

56. Internal Plan documents show the 8.5% "actuarial return target" exceeded Meketa's 20-year capital markets assumptions for all but the riskiest asset classes, EME and PE. In presenting its long-term expected return assumptions for asset classes, Meketa told the Trustees: "The expected returns for many asset classes are not conducive to achieving [the] goal [of] [a long term target return between 7.5% and 8.5%]… [and] [a]s a result, [the Plan] allocates more heavily

to the higher returning asset classes in order to increase the likelihood of reaching the 8.5% target return." Meketa's accompanying chart shows only EME and PE as exceeding the "8.5% Target." Similarly, Meketa advised: "Given the historically low interest rates, investing a larger portion of a plan's assets in riskier asset classes may be the only way to achieve a plan's targeted return…." Meketa also knew as the investment consultant to another Taft-Hartley plan with a similarly high-risk asset allocation significantly overweight in EME and PE (the American Federation of Musicians & Employers Pension Fund ("AFM-EPF"), that the AFM-EPF's actuary, Milliman, refused the trustees' request to increase the 7.5% actuarial return assumption based on the plan's high risk asset allocation.

57.    Internal Plan documents show the Trustees and their advisors knew EME and PE exposed the Plan assets to the known danger of extreme volatility and illiquidity and lack of transparency. Meketa advised the Trustees: "Based on Meketa Investment Groups long-term expectations, only a handful of asset classes are priced to produce returns above 8% per year [and] [a]ll of these asset classes incorporate a high degree of volatility." Meketa advised: "all asset classes with high expected returns are likely to underperform their 'safer' counterparts over relatively frequent short term horizons." Concerning, EME, Meketa highlighted the risks of high volatility – "Significant short-term relative performance risk – and high cost – "More expensive (higher management fees, trading cost, custody costs, etc.)". Near term losses posed a significant danger to the Plan's financial condition, even if greater returns were achieved in later years.

58.    Concerning PE, Meketa highlighted the risks of "Illiquidity", "Higher management fees (1.5% to 2.5% per year on committed capital, plus performance fees)" and "Lack of transparency." Meketa's reports as investment consultant and alternatives asset manager also stated under "Disclaimer": "This report does not contain all the information necessary to fully

evaluate the potential risks of any of the investments described herein. Because of inherent uncertainties involved in the valuations of investments that are not publicly traded, any estimated fair values shown in this report may differ significantly from the values that would have been used had a ready market for the underlying securities existed, and the differences could be material. Note that for unlisted securities the valuations may be lagged by one or more calendar quarters, or may reflect the original cost."

59.     During the Class Period, 30% or more of the Plans' assets were allocated to EMEs and PE. In March 2014, Meketa advised: "Relative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity."

60.     In addition, the Trustees and their advisors maintained significant allocations to other high-risk private market alternatives classes managed by Meketa, including infrastructure, and natural resources. During the Class Period, the EME and PE investments together with the Plan's other high risk alternative investments constituted more than 50% of the Plan's assets.

61.     The following chart shows the Plan's investment allocations to EMEs, PE and other alternatives during the stated years:

| Asset Class | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 Q2 (6/30) |
|---|---|---|---|---|---|---|---|
| Hedge (incl. underlying hedge) | 4.3% | 5.0% | 5.8% | 4.6% | 4.6% | 5.5% | 5.8% |
| Private Equity | 17% | 19.6% | 19.9% | 18.3% | 20.6% | 20.0% | 21.2% |
| Infrastructure | 6.1% | 8.1% | 7.9% | 6.4% | 6.7% | 4.6% | 4.7% |
| Natural Resources | 7.8% | 7.3% | 8.9% | 9.5% | 10.1% | 8.8% | 8.4% |
| Emerging Market Equities | 15.4% | 15.6% | 14.7% | 15.6% | 13.5% | 15.0% | 15.0% |
| **Total** | **50.6%** | **55.6%** | **57.2%** | **54.4%** | **55.5%** | **53.9%** | **55.1%** |

62.    The following is data from the Wilshire Trust Universe Comparison Service for other Taft-Hartley plans, which reflects that the Plan's aggressive asset allocation is an extreme outlier:

| Year | U.S. Equities | Intl Equities | U.S. Fixed Inc | Real Estate | Alternatives | Cash |
|------|---------------|---------------|----------------|-------------|--------------|------|
| **2013** | | | | | | |
| Large | 45 | 12 | 23 | 3 | 12 | 3 |
| Small | 51 | 8 | 30 | 0 | 0 | 3 |
| **2014** | | | | | | |
| Large | 48 | 12 | 19 | 3 | 12 | 3 |
| Small | 51 | 9 | 27 | 3 | 0 | 3 |
| **2015** | | | | | | |
| Large | 46 | 12 | 24 | 3 | 13 | 3 |
| Small | 48 | 9 | 32 | 1 | 0 | 4 |
| **2016** | | | | | | |
| Large | 47 | 11 | 22 | 3 | 13 | 3 |
| Small | 49 | 9 | 30 | 1 | 0 | 4 |

### 2. Extraordinary Percentage of Plan Assets Allocated High-Risk, High-Cost Volatile EME

63.    To chase the excessive 8.5% "actuarial return target," Defendants maintained an extraordinary percentage of the Plan's assets in high-risk, high-cost volatile EME, grossly over-exposing the Plan's assets to high risk and volatility, as the Plan remained in dangerous financial condition. The average Taft-Hartley plan had 4.5% of assets in EME. Nonetheless, during the Class Period, Defendants maintained 13.5% to 15.6% of the Plan's assets in EME, to "enable the Fund to assume an 8.5% [actuarial] return."

64.    As alleged above, Defendants knew volatility in the "significantly overweight" EME asset class was a mortal enemy to the Plan in its dangerous condition, as near term losses lower the base for subsequent compounding even if high returns occur in later years, particularly where, as here, the Plan required significant cash outflows. According to Meketa's capital markets assumptions, EME was the highest risk asset class in terms of volatility.

65.     During the Class Period, EME continued to experience high volatility. In January, 2014 Meketa advised: "So far in 2013, economic growth in most developed economies has been close to expectations, while emerging market economic growth has been slower than expected and more varied"; "The recent increase in interest rates and reduction in liquidity will likely weigh on growth in emerging markets"; "China growth in 2013 has disappointed, resulting in lower demand for commodities and other emerging markets goods"; "The recent increase in real interest rates and reduction in global liquidity, along with declining demand from China, will likely create headwinds for emerging market growth"; Uncertainties around global demand (particularly from emerging markets), stimulative monetary policy, and geopolitical tensions will likely cause heightened volatility".

66.     In March 2014, Meketa repeated the advice concerning continued headwinds and heightened volatility in emerging markets. Meketa further advised the Plan's significantly overweight allocation to EME was hurting the Plan's returns. Meketa advised: "Relative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity." Meketa advised: "Pension Funds that performed strongly in 2013 had large allocations to domestic and developed international equities, . . . . They also had smaller allocations to emerging markets debt and emerging markets equity, which returned -9.0 and -2.6%, respectively."

67.     In May 2014, Meketa advised" "Pension Funds that performed strongly in 2013 had large allocations to domestic and developed international equities, which gained 33.6% and 22.8%, respectively. They also had smaller allocations to emerging markets debt and emerging markets equity, which returned -9.0 and -2.6%, respectively." Meketa provided the following comparison:

**Pension Fund vs. U.S. Taft-Hartley Peers**
Equity Allocation

|  | Current Policy | U.S. Peer Group | Difference | 10-Year Index Return[1] | 20-Year Expected Return |
|---|---|---|---|---|---|
| **Total Equities** | 55% | 50% | +5% | - | |
| Domestic Equity | 18 | 32 | -14 | 7.4% | 8.2% |
| International Developed Equity | 6 | 12 | -6 | 6.9% | 9.0% |
| International Emerging Markets Equity | 16 | 2 | +14 | 11.2% | 12.0% |
| Private Equity | 15 | 4 | +11 | 13.2% | 10.5% |

Meketa advised: "Relative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity." Meketa advised: "In 2013, the Pension & Retirement Fund returned 9.6%, gross of fees (these numbers will be revised as private market figures become available). This return, on an absolute basis, exceeded the 8.5% return expectation. Compared to peers however, this return ranked below the median return of the peer group. This was not surprising given the Fund's relatively large allocation to emerging markets equity and debt compared to peers."

68.    In August, 2014, Meketa advised: "Forecast for GDP in major economies recently increased, while estimates for emerging markets excluding China fell."

69.    A September 2014 IMF Staff Discussion Note observed: "the IMF's October 2014 [WEO] envisage EM medium-term growth at 3 percentage points below where it was predicted to be when the forecast was made in 2010 . . . ," and "[t]he IMF's medium-term outlook for Ems was progressively marked down by more than a half percentage point per year between 2010 and 2013, suggesting continued deterioration in sentiment toward Ems growth prospects." *IMF Staff Discussion Note, Emerging Market Volatility: Lessons from the Taper Tantrum* (September 2014) (p. 15). A September 2014 IMF Working Paper likewise observed:

> Most emerging markets started to experience a broad-based economic slowdown within three years of the Lehman fallout. Emerging Asia was the first region to decelerate, with growth

> slowing down in about 90 percent of the countries in early 2011. Other regions lost steam shortly after, with more than 80 percent of Middle East and South Africa group facing a slowdown by the end of 2011. Latin America and EM Europe decelerated soon after, mostly in late 2012-early 20 13….Considering all regions, by 2012Q3 over 85 percent of the Ems in our sample were decelerating simultaneously ….

*IMF Working Paper: Growth Surprises and Synchronized Slowdowns in Emerging Markets -An*

*Empirical Investigation*, Ghada Fayad and Robert Perilli (September 2014) at p. 8. The IMF Paper

further observed:

> Average real GDP growth in emerging markets was revised down by 1.1 percentage points between the publication of the IMF's [WEO] in the Fall of 2012 and its sequel in the Fall of 2013. This compares to a trimming of less than 0.4 percent for advanced economies…, indicating that the EM slowdown was also influenced by domestic and idiosyncratic factors. In addition, downward revisions in near-term growth were accompanied by revisions in the medium term growth forecast, suggesting that part of the slowdown reflected a reexamination of potential output. For instance, WEO's medium term projection (gauged as the five-year ahead growth forecast) was revised down by 0.7 percentage points for emerging markets, against a 0.1 percent revision for advanced economies, during this period.

(*Id.* at 9.)

70.     The Plan's EME exposure was in fact greater than the 15% of the Plan assets in

dedicated EME investments. For example, in January 2015, Meketa advised: Plan's investment in

Artisan Global Value "[r]ecently… trailed the MSCI World Index due to a 10% cash position and

holdings in emerging markets equities." The Plan's Private Markets Portfolio also included a $15

million investment in Actis Emerging Markets 3, L.P.

71.     In November, 2015, Meketa advised: "The current environment of strong US dollar

has hurt emerging market returns"; "Emerging market equity is a high risk asset class and,

correspondingly, drawdowns can be severe"; "Emerging markets have experienced significant

volatility around a generally outperforming trend"; "Emerging market countries have a history of

being at the center of financial crises"; "The risks [in EME] still remain. Higher level of volatility.

Less diversification benefit versus 15-20 years ago. Event and political risk." Meketa further

advised: "Institutional investors have made significant allocations to emerging market equities in

the past 10 years. -Average allocation for pension funds is 4.5%'; "Meketa… recommends long

term investors allocate to emerging market equities according to the following guidelines:

Minimum allocation: 10% of total equities allocation to emerging markets. Base case: most long-

term investors allocate 20-25% of total equities allocation. Needing high returns: consider 30% or

more of total equities allocation to emerging markets." The Plan's allocation to its dedicated EME

investments of total equities during the class period as a percent were as follows:

| Plan EME Assets as a % of Total Plan Equities Assets | | | | | | |
|---|---|---|---|---|---|---|
| **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020 Q2 (6/30)** |
| 26.4% | 27.4% | 26.4% | 26.4% | 26.4% | 26.1% | 27.5% |

72.    In January 2016, Meketa advised: "Emerging markets have recently experienced

lower investment returns, due in part to slowing growth in China, declining commodity prices, and

a stronger U.S. dollar"; "Additionally, several emerging economies recently began cutting interest

rates. If another major decline in growth occurs, central banks would have few tools available to

stimulate growth. Growth in emerging markets economies could be uneven going forward, with

commodity export-dependent economies particularly hurt by a sustained slowdown in global

growth and prices. The future of China's economy is a key consideration in emerging markets."

73.    Meketa knew on January 26, 2016, Thomas E. Perez, then-Secretary of the U.S.

Department of Labor, filed an action under ERISA against fiduciaries of the IAM Pension Fund,

a Taft-Hartley, multi-employer, defined benefit pension plan, alleging the trustees, among other things, failed to loyally and prudently select the plan's service providers and created conflicts of interest by, among other things, hiring Meketa, an independent plan investment consultant, as a discretionary private markets portfolio manager. *Perez v. Roach, Jr. et al,* District of Columbia District Court, Case No. 1:16-cv-00120. The complaint alleged Meketa, as financial consultant, prepared a strategic investment plan, which, among other things, recommended the plan hire an additional discretionary private markets investment manager. *Id.* ¶¶57 The Trustees ultimately hired Meketa in that role and hired the plan's other financial consultant, Segal Advisors, Inc., to monitor Meketa in Meketa's role as investment manager, for which the plan paid Segal additional compensation. *Id.* ¶62-64. The complaint alleged the trustees "knew that hiring Meketa as Investment Manager… of the Private Markets Portfolio would create multiple conflicts given Meketa's many roles with the Fund… [, a]s a result of the conflicts created by the [trustees'] hiring of Meketa as investment manager…, it was necessary for the Fund to hire a firm to monitor Meketa in this role at an additional cost to the Fund… [and] [t]his additional cost would not have been necessary if the [t]rustees had hired someone other than Meketa as investment manager…" *Id.* ¶¶63-64

74.    While serving as independent investment consultant for the AFM-EPF, Meketa made a similar, unseemly pitch to serve as the AFF-EPF discretionary PE manager, which the AFM-EPF counsel characterized as reflecting Meketa's "bad judgment." Meketa did not meaningfully disclose the *Perez* allegations to the AFM-EPF); rather, Meketa refused to give the AFM-EPA "any solid information" and instead provided "contradictory" information that was "carefully worded and misleading." The AFM-EPF trustees rejected Meketa's unseemly pitch so serve in the dual role.

75.     Meanwhile, in early February 2016, Meketa advised the AFM-EPF the discretionary portfolios managed by Meketa for other clients were completely out of emerging markets equities due to global uncertainty and China conditions unless constrained to maintain such an allocation. Meketa also advised the AFM-EPF of the significant downside risk and limited upside potential of EMEs in the then-current environment and recommended the AFM-EPF substantially to de-risk from EME and recue its EME allocation by 40%. Meketa had previosuly advised the AFM-EPF that the reason it underperformed its Taft-Hartley peers was due to its overweight allocations to EME and PE and underweight allocations to domestic equities.

76.     Vontobel was removed from the Plan in 2016. The Trustees added another EME fund, SSgA/MSCI index, investing $35 million on August 31, 2016.

77.     On April 26, 2017, the Trustees added another actively managed EME fund, GQG Partners, investing $36 million On April 28, 2018, the Trustees added $28 million to the GQG EME investment.

78.     The following chart shows the Plan's EME asset values reported to the Trustees by Meketa during the Class period:

|  | Total EME ($ million) | Aberdeen ($ million) | Dimensional ($ million) | Vontobel ($ million) | SSgA ($ million) | GQG ($ million) |
|---|---|---|---|---|---|---|
| 12/31/2013 | 229.2 | 107.9 | 47.3 | 74.1 | - | - |
| 11/30/2014 | 221.5 | 100.1 | 38.5 | 82.9 | - | - |
| 12/31/2014 | 209.6 | 94.0 | 37.3 | 78.3 | - | - |
| 12/31/2015 | 186.7 | 81.1 | 34.0 | 71.6 | - | - |
| 12/31/2016 | 170.6 | 94.0 | 42.6 | 0 | 34.0 | - |
| 1/31/2017 | 179.5 | 98.6 | 45.1 | - | 35.8 | - |
| 12/31/2017 | 192.8 | 66.0 | 44.0 | - | 46.7 | 36.1 |
| 6/30/2017 | 200.8 | 79.7 | 50.0 | - | 40.2 | 30.9 |
| 1/31/2018 | 208.0 | 71.1 | 46.9 | - | 50.6 | 39.5 |
| 6/30/2018 | 177.7 | 33.7 | 40.3 | - | 43.5 | 60.2 |
| 10/31/2018 | 157.3 | 31.1 | 34.8 | - | 39.3 | 52.2 |
| 12/31/2018 | 163.4 | 32.4 | 36.3 | - | 39.8 | 55.0 |
| 3/31/2019 | 180.5 | 35.8 | 39.5 | - | 43.7 | 61.5 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **7/31/2019** | 184.1 | 37.0 | 38.8 | - | 43.2 | 65.1 |
| **12/31/2019** | 195.1 | 39.1 | 41.7 | - | 47.1 | 67.4 |
| **3/31/2020** | 147.5 | 28.9 | 28.5 | - | 35.8 | 54.2 |
| **6/30/2020** | 180.3 | 35.2 | 36.1 | - | 42.6 | 66.4 |

79.    The Plan's extraordinary EME allocation continued to experience high volatility resulting in lost returns during the Class Period. Based on the EME asset values reported by Meketa, the asset transfers listed in Meketa's reports and the removal of Vontobel from the Plan portfolio (assuming the approximately $13.2 million Vontobel market value balance as of 3/31/2016 of $73.2 million after transfers from Vontobel to other Plan investments remained somewhere in the Plan but was not transferred to the Plan's dedicated EME investments), the Plan *lost approximately $31 million* in value on the EME assets from January 1, 2014 through June 30, 2020. (73.2-35)

80.    The following chart shows the yearly management fees for the dedicated EME investments:

| | **Aberdeen ($ thousand)** | **Vontobel ($ thousand)** | **Dimensional ($ thousand)** | **SSgA ($ thousand)** | **GQG ($ thousand)** | **TOTAL ($ million)** |
|---|---|---|---|---|---|---|
| 2014 | 944.8 | 756.8 | 435.4 | - | - | 2.137 |
| 2015 | 722.1 | 655.3 | 279.8 | - | - | 1,657.2 |
| 2016 | 837.8 | 149.4 | 244.8 | - | - | 1,232.0 |
| 2017 | 633.2 | - | 324.6 | 67.6 | 112.1 | 1,137.5 |
| 2018 | 356.8 | - | 337.4 | 70.8 | 261.2 | 1,026.2 |
| 2019 | 310.1 | - | 284.0 | 39.3 | 360 | 993.4 |
| 2020 | 331.9 (est.) | - | 304.1 (est.) | 70.6 (est.) | 437.8(est.) | 1.144 (est.) |

81.    The Plan's EME investments generally substantially lagged the S&P 500, the Dow Jones Industrial Average ("DJIA"), and the Vanguard Balanced Index Fund ("VBIAX"). The following table shows total Plan EME investment performance as reported by Meketa for the Class Period compared to the S&P, DJIA, and VBIAX returns:

| | **PY 2014** | **PY 2015** | **PY 2016** | **PY 2017** | **PY 2018** | **PY 2019** | **PY 2020** |
|---|---|---|---|---|---|---|---|
| **Plan EME** | 2.0% | -10.9% | 10.6% | 34.2% | -15.4% | 19.3% | -7.6% |

| | | | | | | | (as of end Q2) |
|---|---|---|---|---|---|---|---|
| **S&P 500** | 11.39% | -0.73% | 9.54% | 19.42% | -6.24% | 28.88% | -4.4% (as of end Q2) |
| **DJIA** | 7.52% | -2.23% | 13.42% | 25.08% | -5.63% | 22.34% | -9.9% (as of end Q2) |
| **Vanguard Blncd. Idx Fd. Adm. (VBIAX)** | 10% | 0.51% | 8.77% | 13.89% | -2.86% | 21.79% | -0.8% (as of end Q2) |

82.    The Plan had $229.2 million in dedicated EME investments as of January 1, 2014, and had $221.5 million in dedicated EME investments as of November 30, 2014. $229.2 million invested on January 1, 2014 in Vanguard Balanced Index Fund Admiral Shares (VBIAX) would have a value as of October 12, 2020 of $411.2 million (gross of fees). $221.5 million invested in VBIAX on November 30, 2014 would have a value of $362.1 million (gross of fees) as of October 12, 2020.

83.    The Trustees and their advisors knew the EME investments were losing vital returns for the Plan, which remained in dangerous and worsening financial condition. Prudent fiduciaries would not have allocated and maintained 13% to more than 15% of Plan assets to EME, particularly with the other extraordinarily overweight allocations to other high risk illiquid assets in the dangerous financial circumstances facing the Plan where near term returns were vital to recovery. The Trustees and their advisors imprudently did so, resulting in substantial losses of returns in the Class Period.

### 3.    Extraordinary Allocation of Plan Assets To High-Risk, High Cost Dark Private Market Alternatives

84.    The Plan's extraordinary significantly overweight allocation to EME was particularly imprudent given the extraordinary substantially overweight allocation of Plan assets to PE and other private market alternatives. As alleged above, 50% of the Plan's assets were allocated to EME and PE and other private market alternatives during the Class Period. The

extraordinary overweight allocation of Plan assets to high risk, high cost, illiquid alternative investments, as with the significant overweight EME allocation, was to chase the 8.5% "actuarial return target," as the Plan remained in dangerous and worsening financial condition. Further, the heavy allocation of Plan assets to illiquid alternatives has exposed the Plan to additional risk of losses in the pandemic-related financial crisis, as alternative private market investments have been hit with redemption requests by investors and some portfolio companies have been crushed and failing.

85.     The Plan's alternative private market investments include PE, Natural Resources and Infrastructure. Meketa provided quarterly reports to the Trustees regarding the alternatives. FC provided a report annually to the Trustees concerning FC's review of Meketa's services in Meketa's capacity as an investment manager for the Plan's PE, Natural Resources and Infrastructure portfolios.

86.     The significantly overweight allocation of Plan assets to private alternatives investments constituted an imprudent high risk for the Plan, particularly given the Plan's significantly overweight allocation to high risk, high cost EME and the Plan's dangerous financial condition. Meketa's current Form ADV, Part 2A Brochure filed with the SEC includes the following:

> Private market investments involve a significant degree of risk and are suitable only for sophisticated clients who have no immediate need for liquidity of the amount invested and who can afford a risk of loss of all or a substantial part of such investment.
>
> *  *  *
>
> There is no assurance that such investments will be profitable and there is a substantial risk that associated losses and expenses will exceed income and gains.
>
> *  *  *

. . . the performance of any private market investment is subject to numerous factors which are neither predictable nor within our or our client's (as the case may be) control.

\* \* \*

Private market investments require a commitment by clients for an extended period of time to contribute substantial amounts of capital, if and when called and often on short notice. Clients who are unwilling or unable to comply with their capital contribution obligations risk forfeiture of a portion, and possibly all, of their investments. Furthermore, clients will generally not be permitted to transfer their interests in such investments without the consent of the private market investment manager, which generally may be granted or withheld in the private market investment manager's sole discretion, and upon satisfaction of certain other conditions, including compliance with applicable federal, state, and non-U.S. securities laws.

The structure of private market investments precludes investors and their representatives (including us) from actively participating in the investment decisions and management of the private market investment manager or its affiliates that manage the investments. Clients are required to rely entirely upon the judgement and the ability of the private market investment manager in making underlying investments and neither clients nor we will be able to evaluate the risks and economic merits of potential investment opportunities that come to the attention of the private market investment manager.

There generally will be little or no publicly available information regarding private market investments, their investment managers, or their prospects. Many investment recommendations and/or investment decisions made by us will be based on information from non-public sources, and we often will be required to make investment recommendations and/or investment decisions without complete information or in reliance upon information provided by private market investment managers and other third parties that is impossible or impracticable to verify.

Meketa, Disclosure Brochure (Form ADV, Part 2A) (June 2020), at 6-7, available at

https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS

N_ID=651318 (last visited Oct. 13, 2020) (emphasis added).

87.    Likewise, Meketa's quarterly reports to the Trustees as investment consultant and

alternatives manager stated the following disclaimers:

The data are provided for informational purposes only, **may not be complete, and cannot be relied upon for any purpose other than for discussion**.

Meketa Investment Group has prepared this report on the basis of sources believed to be reliable. The data are based on matters as they are known as of the date of preparation of

the report, and not as of any future date, and will not be updated or otherwise revised to reflect information that subsequently becomes available.

\* \* \*

In general, the valuation numbers presented in this report are prepared by the custodian bank for listed securities, and by the fund manager or appropriate General Partner in the case of unlisted securities. The data used in the market comparison sections of this report are sourced from various databases. These data are continuously updated and are subject to change.

**This report does not contain all the information necessary to fully evaluate the potential risks of any of the investments described herein. Because of inherent uncertainties involved in the valuations of investments that are not publicly traded, any estimated fair values shown in this report may differ significantly from the values that would have been used had a ready market for the underlying securities existed, and the differences could be material.** Note that for unlisted securities the valuations may be lagged by one or more calendar quarters, or may reflect original cost.

*See, e.g.,* Meketa Fund Evaluation Report, Investment Review, Mar. 10-13, 2014, at pp. 2, 164(emphasis added); Meketa Fund Evaluation Report, Investment Review, Oct. 30-31, 2017, at pp. 2, 86 (emphasis added). Similarly:

INFORMATION USED TO PREPARE THIS REPORT WAS OBTAINED FROM INVESTMENT MANAGERS, CUSTODIANS, AND OTHER EXTERNAL SOURCES. WHILE WE HAVE EXERCISED REASONABLE CARE IN PREPARING THIS REPORT, **WE CANNOT GUARANTEE THE ACCURACY OF ALL SOURCE INFORMATION CONTAINED HEREIN.**

*See, e.g.,* Meketa Fund Evaluation Report, Investment Review, Oct. 30-31, 2018, at p. 111(emphasis added); Meketa Fund Evaluation Report, Investment Review, Mar. 18-19, 2020, at p. 96 (emphasis added).

88.    Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2014, as follows:

| Aggregate Private Equity Program | |
|---|---|
| Number of Partnerships | 67 |
| Committed Capital | $406.3 million |
| Capital Called | $328.5 million |
| Distributions | $231.3 million |

| Reported Value | $236.8 million |
|---|---|
| Total Value Multiple | 1.4x |
| Gross IRR | 12.9% |
| Net IRR | 12.3% |

| Aggregate Natural Resources Program | |
|---|---|
| Number of Partnerships | 19 |
| Committed Capital | $126.7 million |
| Capital Called | $92.0 million |
| Distributions | $20.2 million |
| Reported Value | $75.6 million |
| Total Value Multiple | 1.0x |
| Gross IRR | 0.8% |
| Net IRR | 1.2% |

| Aggregate Infrastructure Program | |
|---|---|
| Number of Partnerships | 14 |
| Committed Capital | $128.1 million |
| Capital Called | $124.0 million |
| Distributions | $69.9 million |
| Reported Value | $85.3 million |
| Total Value Multiple | 1.3x |
| Gross IRR | 5.5% |
| Net IRR | 5.1% |

Meketa's 2014 capital markets assumptions for the portfolios were: PE 9.8%; Natural Resources 8.5%; Infrastructure 8.3%; Public U.S. Equity 7.8%.

89.    Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2015, as follows:

| Aggregate Private Equity Program | |
|---|---|
| Number of Partnerships | 78 |
| Committed Capital | $454.4 million |
| Capital Called | $359.7 million |
| Distributions | $279.4 million |
| Reported Value | $237.1 million |
| Total Value Multiple | 1.4x |
| Gross IRR | 12.3% |
| Net IRR | 11.7% |

| Aggregate Natural Resources Program | |
|---|---|
| Number of Partnerships | 23 |
| Committed Capital | $150.6 million |
| Capital Called | $107.4 million |
| Distributions | $25.3 million |
| Reported Value | $81.6 million |
| Total Value Multiple | 1.0x |
| Gross IRR | -0.1% |
| Net IRR | -0.5% |

| Aggregate Infrastructure Program | |
|---|---|
| Number of Partnerships | 19 |
| Committed Capital | $147.4 million |
| Capital Called | $136.8 million |
| Distributions | $82.8 million |
| Reported Value | $103.5 million |
| Total Value Multiple | 1.3x |
| Gross IRR | 7.2% |
| Net IRR | 6.8% |

Meketa's 2015 capital markets assumptions for the portfolios were: PE 9.6%; Natural Resources 8.5%; Infrastructure 8.3%; Public U.S. Equity 7.8%.

90.     Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2016, as follows:

| Aggregate Private Equity Program | |
|---|---|
| Number of Partnerships | 84 |
| Committed Capital | $475.5 million |
| Capital Called | $392.7 million |
| Distributions | $336.5 million |
| Reported Value | $238.1 million |
| Total Value Multiple | 1.5x |
| Gross IRR | 12.2% |
| Net IRR | 11.6% |

| Aggregate Natural Resources Program | |
|---|---|
| Number of Partnerships | 26 |

| | |
|---|---|
| Committed Capital | $160.1 million |
| Capital Called | $126.9 million |
| Distributions | $32.2 million |
| Reported Value | $103.6 million |
| Total Value Multiple | 1.1x |
| Gross IRR | 1.8% |
| Net IRR | 1.4% |

| Aggregate Infrastructure Program | |
|---|---|
| Number of Partnerships | 21 |
| Committed Capital | $154.4 million |
| Capital Called | $146.1 million |
| Distributions | $110.8 million |
| Reported Value | $97.2 million |
| Total Value Multiple | 1.4x |
| Gross IRR | 7.8% |
| Net IRR | 7.4% |

Meketa's 2016 capital markets assumptions for the portfolios were: PE 9.4%; Natural Resources 8.4%; Infrastructure 8.1%; U.S. Equity 7.8%.

91.    Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2017, as follows:

| Aggregate Private Equity Program | |
|---|---|
| Number of Partnerships | 90 |
| Committed Capital | $497.8 million |
| Capital Called | $426.3 million |
| Distributions | $411.2 million |
| Reported Value | $239.5 million |
| Total Value Multiple | 1.5x |
| Gross IRR | 12.7% |
| Net IRR | 12.2% |

| Aggregate Natural Resources Program | |
|---|---|
| Number of Partnerships | 31 |
| Committed Capital | $170.7 million |
| Capital Called | $144.0 million |
| Distributions | $40.1 million |
| Reported Value | $116.7 million |

| Total Value Multiple | 1.1x |
|---|---|
| Gross IRR | 1.8% |
| Net IRR | 3.4% |

| Aggregate Infrastructure Program | |
|---|---|
| Number of Partnerships | 23 |
| Committed Capital | $159.3 million |
| Capital Called | $155.0 million |
| Distributions | $153.2 million |
| Reported Value | $81.7 million |
| Total Value Multiple | 1.5x |
| Gross IRR | 8.7% |
| Net IRR | 8.3% |

Meketa's 2017 capital markets assumptions for the portfolios were: PE 9.4%; Natural Resources 8.4%; Infrastructure 8.4%; U.S. Equity 7.5%.

92.     Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2018, as follows:

| Aggregate Private Equity Program | |
|---|---|
| Number of Partnerships | 98 |
| Committed Capital | $536.3 million |
| Capital Called | $459.1 million |
| Distributions | $467.0 million |
| Reported Value | $252.0 million |
| Total Value Multiple | 1.5x |
| Gross IRR | 12.9% |
| Net IRR | 12.4% |

| Aggregate Natural Resources Program | |
|---|---|
| Number of Partnerships | 35 |
| Committed Capital | $188.2 million |
| Capital Called | $155.8 million |
| Distributions | $51.7 million |
| Reported Value | $111.7 million |
| Total Value Multiple | 1.0x |
| Gross IRR | 1.1% |
| Net IRR | 0.8% |

| Aggregate Infrastructure Program | |
| --- | --- |
| Number of Partnerships | 25 |
| Committed Capital | $167.0 million |
| Capital Called | $165.8 million |
| Distributions | $170.4 million |
| Reported Value | $84.1 million |
| Total Value Multiple | 1.5x |
| Gross IRR | 8.8% |
| Net IRR | 8.4% |

Meketa's 2018 capital markets assumptions for the portfolios were: PE 8.3%; Natural Resources 8.7%; Infrastructure 7.3%; U.S. Equity 7.3%.

93.    Meketa reported the following for the Plan's PE, Natural Resources and Infrastructure portfolios as of December 31, 2019, as follows:

| Aggregate Private Equity Program | |
| --- | --- |
| Number of Partnerships | 106 |
| Committed Capital | $578.7 million |
| Capital Called | $503.5 million |
| Distributions | $525.6 million |
| Reported Value | $275.3 million |
| Total Value Multiple | 1.59x |
| Gross IRR | 12.6% |
| Net IRR | |

| Aggregate Natural Resources Program | |
| --- | --- |
| Number of Partnerships | 40 |
| Committed Capital | $212.7 million |
| Capital Called | $165.3 million |
| Distributions | $58.7 million |
| Reported Value | $109.0 million |
| Total Value Multiple | 1.01x |
| Gross IRR | 0.0% |
| Net IRR | |

| Aggregate Infrastructure Program | |
| --- | --- |
| Number of Partnerships | 28 |
| Committed Capital | $191.8 million |
| Capital Called | $176.8 million |

| Distributions | $213.5 million |
|---|---|
| Reported Value | $57.1 million |
| Total Value Multiple | 1.53x |
| Gross IRR | 8.4% |
| Net IRR | |

Meketa's 2019 capital markets assumptions for the portfolios were: PE 9.6%; Natural Resources 9.1%; Infrastructure 8.0%; U.S. Equity 8.1%.

94.     Meketa reported the following returns for the Plan's domestic equities and various indices for the Class Period:

| | 2019 (%) | 2018 (%) | 2017 (%) | 2016 (%) | 2015 (%) | 2014 (%) |
|---|---|---|---|---|---|---|
| Plan | 30.5 | -4.8 | 20.6 | 13.2 | 0.8 | 12.2 |
| Russell 3000 | 31.0 | -5.2 | 21.1 | 12.7 | 0.5 | 12.6 |
| Benchmark Plus Invest | 30 | -2.8 | 22.0 | 14.6 | 5.0 | 16.3 |
| S&P 500 | 31.5 | -4.4 | 21.8 | 12.0 | 1.4 | 13.7 |
| Loomis Sayles Small Cup Value | 24.5 | -16.0 | 9.7 | 26.5 | -2.9 | 5.3 |
| Russell 2000 Value | 22.4 | -12.9 | 7.8 | 31.7 | -7.5 | 4.2 |
| Russell 2000 | 25.5 | -11.0 | 14.6 | 21.3 | -4.4 | 4.9 |
| SSGA Russell 1000 | 31.4 | -4.7 | 21.7 | 12.0 | 0.9 | 13.2 |
| Russell 1000 | 31.4 | -4.8 | 21.7 | 12.1 | 0.9 | 13.2 |

95.     Investment risk requires a reward premium. The high risk of private markets investments demands a premium, such as a 3% premium above the S&P 500 or a 4% premium above the Russell 3000.

96.     In a recent paper from the University of Oxford's Journal of Investing, one commentator on private equity noted that large pension funds have earned roughly $1.5 (net of

fees) per $1 invested in private equity funds. The paper concluded that since 2006, this return is about the same as the returns in public equity. *An Inconvenient Fact: Private Equity Returns & The Billionaire Factory*, Ludovic Phalippou, University of Oxford Said Business School (June 2020), at 4, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3623820 (last visited Sept. 21, 2020). According to Phalippou, the private equity funds that began in the period from 2006 through 2015 returned about 11% a year, roughly in line with stocks, and for that return, investors paid some $230 billion in performance fees, most of which went to a relatively few individuals, mostly founders of large PE firms. *Id*. at 3.

97.     Similarly, results from a recent Stanford study of returns for 571 pension plans confirmed that over the last ten years, the mean performance in PE (11.3%) matched returns of U.S. public equity. *The Return Expectations of Institutional Investors*, Aleksandar Andonov and Joshua Rauh, Stanford Graduate School of Business (May 2020).

98.     Another study by Cliffwater collected the Comprehensive Annual Financial Reports of 66 state pension plans. The study shows the past ten years' returns broken down by "major asset classes." Cliffwater found that the average pension fund return is 9.7% and PE as an asset class performed at 14.3%. Stocks were split between US and non-US. US stocks were at 14.1%. The study made clear that there is no difference in returns between PE and US stocks in this sample of the largest 66 pension plans over the past ten years. Long-Term State Pension Performance, 2000 to 2019 (May 2020), available at https://cliffwater.com/research (last visited Sept. 22, 2020).

99.     With respect to Taft-Hartley pension plans, investment management firm Goldman Sachs Group, Inc. notes the following concerning private equity investments:

> Private equity . . . investments are speculative, highly illiquid, involve a high degree of risk, have high fees and expenses that could

> reduce returns, and subject to the possibility of partial or total loss of capital; they are, therefore, intended for experienced and sophisticated long-term investors who can accept such risks.

https://www.gsam.com/content/gsam/us/en/institutions/our-clients/taft-hartley.html#tabpanel_d92=dGFicGFuZWxfZDkyXzEvcHVibGljLzE__ (last visited Sept. 20, 2020).

100.    Aon Hewitt's Target Asset Allocation for the New York State Teacher's Retirement System fund as of 2015 was set to 7.0%, for PE with a permitted range of 4-12%. *Report on the 2015 Recommended Actuarial Assumptions, New York State Teacher's Retirement System, Office of the Actuary*, October 19, 2015, page 30.

101.    Prudent fiduciaries would not have allocated 17-23% of Plan assets to high risk illiquid PE investments, particularly together with the other extraordinary allocations of Plan assets to other high risk investments, in the dangerous condition of the Plan seeking to improve its funding condition and with the availability of liquid U.S. equities at far less cost.

102.    Further, the Trustees' and their advisors' "significantly overweight" allocation of Plan assets to high risk illiquid alternatives investments has exposed the Plan to further risk of losses in the ongoing pandemic and accompanying financial crisis. The pandemic and its formal consequences have precipitated investor redemption requests and have damaged and in some cases doomed private investment portfolio companies.

103.    One commentator, PitchBook, noted that PE exit activity in 2020 Q2 collapsed as PE firms sharply marked down portfolio companies and chose to hold investments. Wylie Fernyhough, PitchBook, *US PE Breakdown Q2 2020*, available at https://pitchbook.com/news/reports/q2-2020-us-pe-breakdown (last visited Sept. 24, 2020).

PitchBook noted "PE firms sharply marked-down portfolio companies during the second quarter of 2020," and:

> Heavy debt loads and the pandemic crisis forced several portfolio companies into bankruptcy. Other portfolio companies may be headed that way, as credit rating agencies downgraded hundreds of PE-backed companies. PE holding times are likely to balloon as we saw during the global financial crisis as sponsors put off exiting until the future is clearer.

104.    IFC similarly noted the negative impact COVID-19 is having on PE funds, especially in the emerging markets, due to the reduction in activity and growth prospects of fund portfolio companies. *Impacts of the COVID-19 Crisis on Private Equity Funds in Emerging Markets*, International Finance Corporation, available at https://www.ifc.org/wps/wcm/connect/publications_ext_content/ifc_external_publication _site/publications_listing_page/covid-19-impact-funds-emerging-markets    (last    visited Sept. 24, 2020). IFC notes that the pandemic is affecting the short-term (one year) and medium-term (two to three years) growth prospects of funds' portfolio companies, which are generally experiencing negative impacts on revenues, costs, and profitability. IFC believes heightened risk aversion could lead to heavy growth in borrowing, bankruptcies, and defaults. "The combination of demand shocks reducing income availability and supply shocks disrupting global value chains is impacting entire business lines and sectors. . . ." IFC noted in the short term, returns for PE funds in emerging markets will take a hit due to significant write-downs in portfolio companies' valuations, exchange rate volatility, and challenges in exiting investments. *Id.*

105.    McKinsey also noted in a recent paper that the global PE portfolio had declined roughly 20% as of March 31. *A rolling disruption: COVID-19's implications for private equity and portfolio companies*, McKinsey & Company (Sept. 2020), available at

https://www.mckinsey.com/industries/private-equity-and-principal-investors/our-insights/a-rolling-disruption-covid-19s-implications-for-private-equity-and-portfolio-companies (last visited Sept. 24, 2020). McKinsey noted about 50% of the PE industry's assets under management are in vulnerable sectors, and concluded that "[a]t the end of the day, investors should brace for increased volatility, downgrades, and defaults" with private equity. *Id.*

106.     Another report by McKinsey noted that valuations amidst the pandemic "[f]or the most part . . . are lower because the performance of business, at a time when demand has been collapsing, is uncertain and public equity multiples are volatile," and PE exits have "all but stopped" due to the pandemic. Alastair Green, Ari Oxman, and Laurens Seghers, *Preparing for private-equity exits in the COVID-19 era*, McKinsey & Company (June 11, 2020), available at https://www.mckinsey.com/industries/private-equity-and-principal-investors/our-insights/preparing-for-private-equity-exits-in-the-covid-19-era (last visited Sept. 26, 2020).

107.     Bain & Company noted a sharp drop-off in buyout and exit transactions, and that drop-offs in investments should be expected as 2020 continues.  Bain also noted heightened illiquidity, with exit transactions falling 72% between the beginning of 2020 through April, as funds ride out the storm before even thinking about selling. Bain noted that 83% of general partners indicated in a survey that they do not expect to exit any of their portfolio companies over the next year. Hugh MacArthur, Graham Elton, and Brenda Rainey, *Covid-19 Hits Private Equity: The Early Data is Not Pretty*, Bain & Company (May 15, 2020), at pp. 1, 7, available at https://www.bain.com/insights/covid-19-hits-private-equity-the-early-data-is-not-

pretty/#:~:text=The%20numbers%20through%20April%20show,%2C%20fund%2Draisi ng%20and%20returns (last visited Sept. 25, 2020). Bain noted that returns will lag in a downturn because mark-to-market calculations are not immediate, and that it is "difficult to value companies in this environment, given the disruption to company cash flows, market volatility and the lack of comparable transactions." *Id*. at 11.

108.    The Trustees and their advisors imprudently exposed an extraordinary percentage of the Plan assets to the highest risk classes including PE and EMEs, as the Plan has remained in dangerous and in fact declining financial condition. The high risk illiquid PE investments did not generate returns worth the high cost and risk and are particularly exposed to losses in the current financial crisis.

### C.    Conflicted Investment Consultant

109.    During the Class Period, Meketa provided to the Plan both nondiscretionary investment consulting and at the recommendation of Meketa, discretionary alternatives asset management services for the Plan's Private Markets Portfolio. This was an imprudent, conflicted structure for Meketa to recommend for the Trustees to approve and upon which to have relied. Meketa had a clear conflict of interest in advising the Trustees concerning a high-risk, high-cost asset allocation to chase the grossly excessive 8.5% "actuarial return target," while also serving as the alternatives asset manager for compensation in addition to the management fees charged by the managed investments. In addition, by using its position as the Plan's nondiscretionary investment consultant to recommend itself to the Plan as private markets asset manager at a substantially greater fee, Meketa exploited its fiduciary position at the unfair expense of the Plan. Further, the conflicts created by the Trustees' hiring of Meketa as investment manager for the

Plan's Private Markets Portfolio required the Plan to hire another firm to monitor Meketa in that role at a substantial additional expense to the Plan.

110.    The following table reflects Meketa's compensation and function for the period 2010-2017, as reflected in the Plan's Form 5500s.

| Year | Compensation | Service Codes | Service Code Type (respectively) |
|------|--------------|---------------|----------------------------------|
| 2009 | $263,926 | 27 | Investment Advisory |
| 2010 | $258,410 | 27, 68 | Investment Advisory; Soft dollars commissions |
| 2011 | $1,399,116 | 27, 68 | Investment Advisory; Soft dollars commissions |
| 2012 | $1,423,341 | 27, 68 | Investment Advisory; Soft dollars commissions |
| 2013 | $1,380,897 | 27, 68 | Investment Advisory; Soft dollars commissions |
| 2014 | $1,401,196 | 27, 50, 52 | Investment Advisory (plan); Direct payment from the plan; Investment management fees paid indirectly by the plan |
| 2015 | $1,382,023 | 27, 50, 52 | Investment Advisory (plan); Direct payment from the plan; Investment management fees paid indirectly by the plan |
| 2016 | $259,614 | 27, 50, 52 | Investment Advisory (plan); Direct payment from the plan; Investment management fees paid indirectly by the plan |
| 2017 | $259,700 | 27, 50, 52 | Investment Advisory (plan); Direct payment from the plan; Investment management fees paid indirectly by the plan |

| 2018 | $256,594 | 27, 50, 52 | Investment Advisory (plan); Direct payment from the plan; Investment management fees paid indirectly by the plan |
|------|----------|------------|---------------------------------------------------|

### D.    Complicit Actuary

111.    Horizon, the Plan's actuary during the Class Period, in the particular circumstances alleged herein, exercised control and discretion over Plan assets and management and rendered investment advice in exchange for compensation. Horizon's use of a grossly-excessive unreasonable 8.5% annual return assumption as the Plan's independent actuary to generate funding and liability projections to show future improvement of the Plan's financial condition was unreasonable and discordant with reality and market conditions and not in accordance with professional standards. In doing so, Horizon was complicit with the Trustees' and Meketa's imprudent asset allocations in order to continue its compensation from the Plan.

112.    According to the National Association of State Retirement Administrators (NASRA), a public fund survey has found that 96% of surveyed public pension plans have lowered investment rate of return assumptions since 2010, with reductions resulting in a decline in the average return assumption from 7.52 percent in fiscal year 2017 to 7.20 percent in fiscal year 2020. NASRA Issue Brief: Public Pension Plan Investment Return Assumptions Updated February 2020, available at https://www.nasra.org/files/Issue%20Briefs/NASRAInvReturnAssumptBrief.pdf (last visited Sept. 20, 2020).

113.    According to a Milliman 2018 Public Pension Funding Study, "[actuarial return] rates have continued to move lower each year, with a median of 7.25% and ranges from 5% to 8.10%.

114.    Actuarial industry professionals recognize that the trend for assumed interest rates is lowering them. David Pitts, owner of Independent Actuarial Services, recently testified with respect to actuarial interest rates:

> "[T]here has been a downward trend in the assumption selection process for both Taft-Hartleys and public sector pensions. . . . The various trends within the different subsectors of the actuarial world to lower interest rates, which would have been the fairly quick lowering of interest rates in the private plan sector, followed much more slowly by the lowering of interest rates in the Taft-Hartley and public sectors."

115.    Horizon employed an 8.5% annual return assumption for the Plan's actuarial projections and valuations. Horizon departed from industry trends and reality apparently to support and justify the extraordinary high risk, high-cost asset allocation to chase the 8.5% "actuarial return target," with the Plan in dangerous financial condition. In doing so, Horizon exercised discretion over Plan assets and provided investment advice in exchange for compensation, imposing fiduciary status and duties on Horizon. Horizon knew or should have known that the 8.5% return assumption was unreasonable and grossly inflated projected improvement, to enable the Trustees to justify and support the extraordinary high risk, high cost imprudent asset allocation.

### E.    Resulting Losses

116.    As alleged herein, Defendants' imprudently deployment and maintenance of an extraordinary high risk asset allocation to chase a grossly excessive and unreasonable 8.5% "actuarial return target." This imprudent gamble with the Plan assets resulted in substantial losses and lost returns to and worsening financial condition and funded status of the Plan in already dangerous financial condition. The Plan's worsening financial condition led to massive benefit reductions to Plan participants.

## VI.    CLASS ACTION ALLEGATIONS

117.    Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce fiduciary liability to the Plan under 29 U.S.C. §1109(a). Further, ERISA Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the Plan to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA.

118.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries of the New York State Teamsters Conference Pension and Retirement Fund through the date of judgment.

119.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

120.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

121.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2018, the Class includes at least 33,606 Plan participants, inclusive of active

50

participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits.

122.    **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.    who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a);

c.    whether Defendants were fiduciaries to the Plan under ERSIA;

d.    whether Defendants breached fiduciary duties to the Plan, participants, and beneficiaries in violation of ERISA;

e.    if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

f.    what Plan-wide equitable and other relief should be imposed in light of Defendants' breaches.

Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

123.  **Typicality:** All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class Members, and the Plan sustained monetary and economic injuries arising out of Defendants' breaches of their fiduciary duties to the Plan.

124.  **Adequacy:** Plaintiff is an adequate representative for the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he was a participant in the Plan during the Class Period; and he is committed to vigorously representing the Class. Plaintiff's retained counsel, Chimicles Schwartz Kriner & Donaldson-Smith, is highly competent and experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

125.  **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all Plan participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records

(including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

126.    Prosecution of separate actions by individual participants and beneficiaries for the breaches of fiduciary duties would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the Plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B). Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

127.    Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## COUNT I

## Violations of ERISA § 404(a)(1)(A)-(D)

### (Against the Board of Trustees and the Trustee Defendants)

128.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

129.    As fiduciaries of the Plan, the Board of Trustees and the Trustee Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's Investment Policy Statement.

130.    The Board of Trustees and the Trustee Defendants were required to manage the Fund and its assets for the benefit of the participants under the particular circumstances of the Fund toward recovery.

131.    The Board of Trustees and the Trustee Defendants breached their fiduciary duties under ERISA to invest the Fund assets prudently and to monitor and manage risk in the Fund's investments. As alleged herein, during the period the Fund has been in dangerous financial condition, the Board of Trustees and the Trustee Defendants imprudently approved and maintained an extraordinary allocation of Plan assets to the highest risk asset classes despite the known high volatility and illiquidity, to chase a grossly excessive and unreasonable 8.5% "actuarial return target," as the Plan's condition continued to decline. The Board of Trustees and the Trustee Defendants also breached their fiduciary duties by imprudently hiring Meketa as the Plan's Private Markets Portfolio manager, which created a conflict of interest with Meketa's role as the Plan's

financial consultant and required the Plan to incur a substantial additional expense for a monitoring firm. The Trustee did not hire the monitor firm, FC, to monitor Meketa's role as investment consultant. The Trustees breached their fiduciary duties by relying on Meketa for investment consulting in the face of Meketa's conflict.

132.    By the foregoing, the Board of Trustees and the Trustee Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's IPS.

133.    As a result of their breaches, the Board of Trustees and the Trustee Defendants caused the Plan to suffer losses for which they are liable.

## COUNT II

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against Meketa)

134.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

135.    As alleged herein, during the Class Period, Meketa exercised discretion or control over Plan assets and rendered investment advice to the Plan. Meketa had a direct conflict of interest in serving as the Plan's investment consultant and as an investment manager, simultaneously.

136.    Meketa formulated and provided asset allocations including extraordinary allocations of Plan assets to the highest risk asset classes knowing that the Plan was in dangerous financial condition in urgent need of near-term returns to chase a grossly excessive and unreasonable 8.5% "actuarial return target." Meketa had a material conflict of interest in doing so. Meketa benefited in its role as investment manager for the Plan's Private Markets Portfolio by the extraordinary high risk, high cost asset allocations to EME, PE and other private market alternative investments, at the expense of the Plan and its participants.

137.    As a fiduciary of the Plan, Meketa was required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's IPS.

138.    By the foregoing, and as alleged more particularly herein, Meketa (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b)

failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's IPS.

139.    As a result of its breaches, Meketa caused the Plan to suffer losses for which it is liable.

## COUNT III

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against Horizon)

140.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

141.    As alleged herein, Horizon actively and knowingly participated in the imprudent approval and maintenance of the Plan's extraordinary high risk, high cost asset allocation to chase a grossly excessive and unreasonable 8.5% "actuarial return target" in the Plan's dangerous and worsening financial condition. Horizon determined and approved a grossly excessive and unreasonable 8.5% actuarial return assumption. An independent actuary applying applicable professional standards would not have determined an 8.5% actuarial return assumption for the Plan.

142.    As a fiduciary of the Plan, Horizon was required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive

purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's IPS.

143.    By the foregoing, and as alleged more particularly herein, Horizon (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), including the Plan's IPS.

144.    As a result of its breaches, Horizon caused the Plan to suffer losses for which it is liable.

## COUNT IV

## Violations of ERISA § 1105(a)

## (Against All Defendants)

145.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

146.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

> (1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

> (2) the fiduciary fails to comply with ERISA §404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

> (3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

147.    Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the imprudent extraordinary investment of the assets of the Plan in the highest risk asset classes, and knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

148.    Defendants knew that the Plan's asset allocation had a substantial and unreasonable percentage of assets allocated to EMEs, PE and other private markets alternative investments, which exposed the Plan to reckless and unreasonable risk and caused substantial injury to the Plan in lost returns. Defendants also knew that the Plan's asset allocation was an extreme outlier compared to allocation of other Taft-Hartley plans. The Defendants also knew that the Plan's overly-risky asset allocation conflicted with the Plan's IPS "Risk Objectives:" "To accept a level of market risk consistent with moderate interim volatility without sacrificing the potential for long-

term real growth of assets"; "To use extensive diversification to minimize exposure to company and industry-specific risks in the aggregate investment portfolio"; and "To avoid extreme levels of volatility that could adversely affect the Plan's participants".

149.    Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts I-III.

150.    As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA §405(a)(1) and (2).

151.    Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiff, and the other Class members have suffered losses.

## PRAYER FOR RELIEF

152.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for (a) recovery of losses to the Plan, (b) the recovery of any profits resulting from the breaches of fiduciary duty, and (c) such other equitable or remedial relief as the Court may deem appropriate.

153.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

154.    WHEREFORE, Plaintiff, on behalf the Plan, himself and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court award the following relief:

A. A declaration that the Defendants breached their fiduciary duties under ERISA;

B. An Order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plan jointly and severally to restore all losses to the Plan which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to ERISA §405;

C. An Order requiring (a) the disgorgement of profits made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with their breach of fiduciary duties or violations of ERISA, (c) an Order requiring the Plan to allocate its assets prudently, or (d) any other appropriate equitable a monetary relief, whichever is in the best interest of the Plan;

D. Ordering, pursuant to ERISA §206(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plan;

E. Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and manage the Plan's investments and/or selection of investments and/or to oversee the divestment of the Plan's imprudent investments and reduction of investment management costs;

F. Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

G.  Awarding Plaintiff and the Class their attorneys' fees and costs and prejudgment interest pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

H.  Awarding pre-judgment and post-judgment interest; and

I.  Awarding all such other remedial or equitable relief as the Court deems appropriate.

### **NOTICE PURSUANT TO ERISA SECTION 502 (h)**

To ensure compliance with the requirements of 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: October 21, 2020

By:    */s/ Leslie A. Blau*
Leslie A. Blau
**BLAU & MALMFELDT**
566 West Adams Street, Suite 600
Chicago, Illinois 60661
Tel: (312) 443-1600
Fax: (312) 443-1665
blaulaw@gmail.com

**OF COUNSEL:**

Steven A. Schwartz (*pro hac vice* to be filed)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
steveschwartz@chimicles.com

*and*

Robert J. Kriner, Jr. (*pro hac vice* to be filed)
Ips Emily L. Skaug (*pro hac vice* to be filed)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808